Filed 11/18/22  P. v. Gordon CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HARRY GORDON,<br><br>    Defendant and Appellant. | F080257<br><br>(Super. Ct. No. F16900715)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2016, appellant Harry Gordon shot his wife three times in her abdomen but she survived. A jury convicted him of attempted premeditated murder (Pen. Code, §§ 664/187, subd. (a);[1] count 1), finding true that he personally inflicted great bodily injury, and he personally and intentionally discharged a firearm. The jury also convicted him of corporal injury to a spouse (§ 273.5, subd. (a); count 2), finding true that he inflicted great bodily injury and he personally used a firearm. In count 1, the court sentenced appellant to life with the possibility of parole, plus a consecutive 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The sentence in count 2 was stayed.[2]

Appellant claims that alleged instructional and cumulative errors occurred. He also asserts that the trial court abused its discretion in imposing certain fines and assessments upon him. We reject his arguments and affirm.

## BACKGROUND

It was undisputed at trial that appellant shot his wife. The issue for the jury was whether appellant had intended to kill her. The defense argued that appellant was mentally ill when this shooting occurred, and he had unreasonably believed his wife was having an affair. The defense also asserted that, stemming from a prescription medication, appellant had been voluntarily intoxicated when he shot his wife. The defense asked the jury to find appellant not guilty of attempted premeditated murder.

Based on the verdicts rendered, it is apparent that the jury rejected the defense's position. We summarize the material facts which support the jury's verdicts. We provide additional facts later in this opinion when relevant to the issues raised.

---

[1]     All future statutory references are to the Penal Code unless otherwise noted.

[2]     In count 2, the court imposed an upper term of four years, with an additional and consecutive 10 years for the firearm enhancement and five years for the great bodily injury enhancement.

2.

## I.    Appellant's Wife Filed for Divorce.

At the time of trial, appellant and his wife had been married for about 28 years, and they have three children together.  The jury learned that they did not have a happy marriage.  They often argued in the years leading up to this shooting.

Appellant had worked for Bay Area Rapid Transit as a supervisor.  After retiring in late 2011, he relocated his family to Fresno in April 2012.  After retiring, appellant stopped doing "almost everything."  He became very withdrawn.

Appellant's wife told the jury that she became increasingly bitter about how appellant was treating her.  In December 2015, she filed divorce papers.  She served appellant with those legal documents after Christmas that year.

## II.    Appellant Gets a Restraining Order against his Wife.

In or about mid-January 2016, appellant and his wife fought over a debit card, which resulted in a tug-of-war.  His wife eventually pulled the card from appellant's hand.  A short time later, appellant went to a hospital to ensure that prior back and knee injuries were not inflamed, and he informed a nurse about the incident, which led to law enforcement being notified about a possible incident of domestic violence.  A deputy became involved, and, about two days after this altercation, appellant had his wife served with a restraining order.  She moved out of their home and she began living with her mother.  After moving out, appellant texted his wife, saying he wanted her to come back and they could work things out, but she did not respond.

## III.    Appellant's Behavior Worsens.

After his wife moved out, appellant began arguing with his children, H.G. (a son) and R.G. (a daughter).  Appellant believed they had taken his wife's side.  Appellant said he did not want a divorce, and he kept asking his daughter if his wife was cheating on him.  She told him that her mother was not having an affair.

On January 24, 2016, about five days before he shot his wife, appellant had an argument with his daughter, and his son told appellant to leave his sister alone.  Appellant

3.

and his son then got into an argument. Appellant was crying and he kept repeating, "Just grab a knife and kill me." His son believed appellant was serious about committing suicide.

At that time, appellant's son, H.G., was 21 years old and his daughter, R.G., was 17 years old. Appellant's son called a non-emergency police number and reported what appellant had said. An officer responded, but, after speaking with everyone, the officer decided no further action was necessary. That night, appellant's son and daughter moved out of the house, and they began living with their mother in their grandmother's residence.

## IV. Appellant Takes Possession of his Firearms Right Before this Shooting.

In or around December 2015, appellant gave his .22-caliber pistol and his .22-caliber rifle to a friend, David S. Appellant told David S. that he and his wife were having marital problems, and appellant was afraid she would do something with the firearms. David S. agreed to store the guns for appellant.

In January 2016, a day or two before this shooting, appellant went to David S.'s residence and they each shot appellant's .22-caliber pistol in David S.'s backyard. Appellant told David S. that he had asked his wife to leave, and he was going to be staying at his house by himself. Appellant said he did not feel safe, and he again took possession of his two firearms.

## V. The Shooting.

On January 29, 2016, appellant's wife, son and daughter were at the residence of a family friend, D.J. They were there providing babysitting and housesitting while D.J. was out of town. D.J. had been married to appellant's wife's second cousin, who had passed away. Appellant's wife had looked after D.J.'s daughter from the time she was born until she was about three and a half years old.

4.

On the day in question, appellant's wife and daughter went outside D.J.'s residence at around 7:30 p.m. when D.J.'s mother, C.B., brought D.J.'s daughter back home after ballet lessons. It was dark outside. At some point, appellant appeared near the driveway and, according to his daughter, he appeared angry. His daughter asked him what he was doing there. Without saying anything, he pushed his daughter aside and he shot his wife from about 10 feet away, striking her abdomen three times. Appellant's wife turned and ran towards the house, and appellant followed her. His daughter shoved appellant, who fell down. His daughter ran towards the house.

While lying on the ground, appellant turned to C.B. and said something like, " 'It's over. I'm done.' " C.B. told appellant to secure his gun, which he did. Appellant holstered his gun and put it on the top of a vehicle parked in the driveway. C.B. asked if he had shot "her" and he said, "Yes, I did."

C.B. was shaking so badly that she had trouble calling 911, but she was eventually able to do so. Appellant gave her the address to tell 911, and he appeared calm. At 7:35 p.m., appellant's son also called 911 from inside the residence, reporting that appellant had shot his wife.

Law enforcement responded almost immediately. Appellant told a responding officer that he had just shot his wife three times. Appellant said his heart was broken, and he believed his wife was having an affair with the homeowner. Appellant tried to move to a better vantage point and said, "I just want to see if she's alive. The damn doors in the way. I think she's not wrapped up. Usually if they are dead they won't take them out for a long time.… So she's still alive. My wife is." He told the officer that they were "having a bitter divorce" and he had "nothing to lose." He said that his wife had turned their children against him.

Appellant told the officer that his daughter had knocked him down and his daughter's actions had probably saved his wife's life. Appellant stated to the officer that he was going to get the death penalty if his wife died, and that was okay because "I

5.

deserve it." Appellant said he had parked his truck down the street about half a block, and a rifle was inside it.

## VI. Appellant's Interview with Law Enforcement.

Two detectives interviewed appellant in the early morning hours the following day after this shooting. Appellant said the incident occurred because his wife was having sex with D.J. Appellant believed this affair was occurring because his wife was "hanging around" D.J. a lot, and appellant had found 17 "g-strings" in her drawer, that she never wore for him.[3]

Appellant told the detectives that, before this shooting occurred, he drove past D.J.'s residence at around 5:30 or 6:00 p.m., and he saw his wife's vehicle in the driveway.[4] He went home and took his medications, including a new one he took for the first time that day. He fed the dogs and he also ate. Appellant said he was "thinking all day" that he should "just kill the fucking bitch." Appellant said he got his gun and went back to D.J.'s house, where he shot his wife. He said he "just kept hearing that I should kill her."

Appellant explained that, when he drove back to D.J.'s residence, he parked down the street and he walked towards the residence. It was his wife's birthday that day, and appellant felt that he "had to do something" so he slashed two of her tires with a small knife. He then waited near some trashcans for a few minutes before "everybody" came out of the house. Appellant said he heard his wife's voice, which made him feel crazy and sick. He complained to the detectives that he was "always good to her" but she was

---

**3**    The jury learned that, on January 23, 2016, appellant had called D.J., asking him if he was having an affair with his wife. D.J. had denied any affair, telling appellant to not contact him again and stay away from his family. D.J. did not tell appellant's wife about appellant's call.

**4**    At about 5:46 p.m. that same afternoon, appellant tried to call D.J., who did not answer.

6.

"shitty" to him and had cheated on him. According to appellant, his wife had ruined his life and turned his children against him.

Appellant believed he had fired his gun five or six times at his wife.[5] He said that his daughter had saved his wife when she "tackled" him from behind and knocked him down. He said that his wife had started to run but he shot her. He said he "felt relief" when he fired. He said he was hoping she died, and he wanted her dead. He then stated that he did not want her to die, and he both hated "her guts" but also did not hate her.

Appellant said he started planning to shoot his wife when he drove by the house the first time. He said he had been taking medication to control his anxiety and panic attacks. However, appellant said he "knew what [he] was doing" when he shot his wife, but he did not care. When told that his wife's medical situation was critical, appellant said he felt "[r]eal bad" and he still loved her.

## VII. The Injuries.

Appellant's wife survived the shooting, but she suffered severe injuries to her stomach, pancreas, and inferior vena cava, a main blood vessel in the abdomen. She was in the intensive care unit of the hospital for three months, followed by additional care lasting more months. Her right kidney was destroyed and her other kidney stopped functioning so she was on a dialysis machine for 24 hours a day. Two months after being placed on the replacement list, she received a kidney replacement. At the time of trial, she was still suffering the physical aftermath of her injuries.

## VIII. Appellant's Mental Health.

Appellant did not testify at trial. His mental health became a cornerstone of his defense.

---

[5] The crime scene technician only found three expended shell casings at the scene.

### A.    The testimony from appellant's sister.

Appellant's sister told the jury that, in the 1990's, appellant was hospitalized for about five to seven days for depression and manic depression. About a year before this shooting, appellant asked her for assistance in determining where he was going to live in his old age. Appellant had said that he could not count on his wife or his children to take care of him. His sister noticed that appellant was deteriorating physically. About seven to 10 days before the shooting, appellant's sister was worried that he would commit suicide. She wanted to take him to a mental health doctor, but he did not believe such a doctor could help him. She believed that appellant's mental health was deteriorating. She knew that, on the day of this shooting, appellant had started mental health treatment.

On the day of this shooting, appellant called his sister and stated that he had proof that his wife was having an affair with D.J. Appellant explained that his wife's vehicle was parked in the driveway, but D.J.'s vehicle was not there. Appellant believed his wife and D.J. had gone away together. His sister had told him that his wife might be babysitting, and she told appellant to calm down. His sister had told him that his belief was unreasonable, but he responded that she did not know everything.

### B.    The testimony from the psychiatrist.

A psychiatrist, Howard Bruce Terrell, testified on appellant's behalf. Terrell met with appellant in August 2018 in the jail, and Terrell interviewed him for a little over two hours. This interview occurred about two years seven months after this crime. Terrell also reviewed approximately 400 pages of documents, including some of appellant's medical records. Terrell reviewed numerous medical reports with the jury regarding various diagnoses that appellant had received from various mental health care providers.

Terrell opined that, at the time of this shooting, appellant had been suffering from severe bipolar disorder, and he had been "severely depressed" and psychotic. However, Terrell also opined that appellant had known what he was doing when he shot his wife with a gun. Even though appellant was mentally ill, appellant "knew it was wrong."

8.

Terrell believed that appellant had known he was shooting his wife and that it could have resulted in her death.

It was Terrell's understanding that appellant had a long history of severe emotional problems going back to the mid-1990's, and appellant had been previously hospitalized for psychiatric treatment. Leading up to this shooting, appellant had been severely depressed from a number of events. Appellant's father had died after collapsing in front of him, and both appellant's mother and another sister had died. Appellant's marriage had been very poor, and appellant had obtained a restraining order against his wife. All of this represented horrible stressors for appellant. According to Terrell, appellant had held a very responsible job but he had to retire at a fairly early age due to severe medical problems. Appellant's depression became worse, and he began "having psychotic symptoms of hearing voices."

During their meeting in the jail, appellant had reported to Terrell that he had experienced auditory hallucinations. Terrell understood that the voices appellant had been hearing probably started approximately a year or two before this crime, and appellant was "hearing a voice" on the day he shot his wife. The voice said something to the effect that appellant's wife was cheating on him, and the voice made comments about killing her. Terrell believed that appellant had been experiencing auditory "command" hallucinations, which were consistent with his mental illness. According to Terrell, command hallucinations are very dangerous when people are psychotic. Their contact with reality is so impaired that, depending on the degree of mental illness and stressors, such a person may actually follow an auditory command hallucination. Terrell also noted that, while appellant was in jail for this crime, he had reported hearing auditory hallucinations in June 2016, and in May and August 2018. A medical note from April 2016 showed that appellant had reported hearing a voice telling him to kill his wife. Terrell found this consistent with appellant's history of being acutely psychotic on the

9.

day of this crime and having a command auditory hallucination telling him to kill his wife.

On the day of the crime, appellant had been in "intensive outpatient treatment." Terrell described this as one step short of psychiatric hospitalization. Appellant had been in this program for a number of hours before this shooting, and this had been appellant's very first day in this treatment. Terrell explained to the jury that appellant's psychiatric treatment was normally reserved for people who are quite mentally ill.

Terrell informed the jury that appellant had reported to him that he had not planned to kill his wife. According to appellant, he brought a gun with him for his own protection because D.J. was supposedly an avid hunter. Appellant had also reported he had planned to damage his wife's vehicle by shooting at it. Appellant reported to Terrell that, after slashing two of the tires on his wife's car, family members had appeared. His estranged wife came out and then "he just suddenly abruptly went and shot her approximately three times." Appellant had denied any plan to shoot his wife until he pulled the trigger, and he did not do so until she suddenly came out of the house. According to Terrell, when appellant told the responding officer at the scene that he was heartbroken, that could be a manifestation of being overwhelmed from the loss of a loving relationship, which would be part of his emotional illness at that time.

Terrell was asked about the significance of appellant stating that he was going to get the death penalty if his wife died and that he deserved it. Terrell testified that even though appellant was mentally ill, he knew what he had done and he knew that his actions were wrong. Appellant had not been trying to escape responsibility.

According to Terrell, appellant had exhibited psychotic behavior when he told the detectives that he had wanted his wife dead but he had also expressed a hope that she did not die. It was Terrell's understanding that no evidence had supported appellant's

10.

paranoid belief that his wife had been unfaithful to him.**6** Terrell explained that, although his wife had not been cheating on appellant, that was how appellant had perceived the world based on his mental illness. Appellant had believed his wife had alienated his children against him. Terrell testified that a rational person would know that his wife was babysitting the child of a deceased relative, especially when that had been occurring for approximately three years. According to Terrell, a person would normally see their wife's car at that home and would understand that they were there babysitting. However, a person who is paranoid, psychotic, and plagued with auditory hallucinations could make a wrong conclusion that the car is there because the spouse was cheating on him.

On cross-examination, Terrell admitted that, if appellant had lied to him, then his diagnosis would be less reliable. Terrell agreed that, if appellant had retrieved his firearm the day before this shooting, practiced using it and then shot his wife with it, that could show premeditation. Terrell explained that he was not saying appellant was unable to "think things through" with his mental illness, and he was not saying that appellant could not plan a crime. However, a person like appellant would have impaired thought processes, depending on the severity of his mental illness at the time.

Terrell agreed that it appeared appellant had never reported hearing voices to his treating physicians before this crime occurred. However, Terrell believed that people like appellant with psychotic mental disorders are "frequently impaired" in their ability to premeditate and deliberate in a rational manner. According to Terrell, appellant's mental functioning "was greatly impaired" on the day of this crime due to his psychotic mental disorder.

---

**6** The jury learned that appellant's wife was not having an affair with D.J. During closing argument, the defense conceded that appellant's belief in this regard had been unreasonable but, according to defense counsel, this showed that appellant was mentally ill.

11.

**IX.     The Impact of Appellant's Medications.**

Appellant had reported taking Trazodone on the day of this crime, which is a type of antidepressant.  He was also taking other medications for his depression.  It was Terrell's understanding that appellant had been prescribed a brand new medication, Klonopin, on the day this shooting occurred.  Terrell explained that Klonopin can help with anxiety, but it can also "disinhibit people" similar to a person imbibing alcohol.  According to Terrell, a person's inhibitions or ability to restrain themselves might be impacted.  Terrell found it "significant" that, even though appellant had been chronically mentally ill for much of his life, this crime was out of character for him,[7] and it occurred "shortly after he took a brand new medication that can cause a person to lose their inhibitions."

## DISCUSSION

**I.     The Trial Court did not Err in Failing to Instruct the Jury on the Concept of "Attempted Involuntary Manslaughter."**

Appellant contends that the trial court committed reversible error in failing to instruct the jury on the concept of "attempted involuntary manslaughter."  He argues that this alleged error was prejudicial, requiring reversal of his conviction for attempted premeditated murder.

*A.     Background.*

In count 1, appellant was charged with attempted willful, deliberate and premeditated murder.  In relevant part, the trial court instructed the jury on the elements of attempted murder, along with the additional allegations of premeditation and deliberation.  The jurors were informed about the doctrine of voluntary manslaughter based on a heat of passion.  Finally, the court told the jurors about the defense of

---

**7**     The jury learned that appellant had never before physically abused his wife.

12.

"diminished actuality"[8] and the jurors were instructed to consider what impact, if any, appellant's auditory hallucinations had on his ability to deliberate and premeditate.

The court did not instruct the jury on the concept of "attempted involuntary manslaughter."[9]

### B.    Standard of review.

Even in the absence of a request, a trial court in a criminal matter must instruct the jury on the general principles of law relevant to the issues raised by the evidence; this encompasses those principles closely and openly connected with the facts before the court which are necessary for the jury's understanding of the case. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.) In doing this review, we view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

### C.    Analysis.

According to appellant, substantial evidence demonstrated that he had been suffering from a mental illness when he shot his wife, and he did not intend to kill her. He notes that the court deemed it appropriate to instruct the jury on the defense of diminished actuality, and it also instructed the jury to consider evidence of hallucination.

---

[8]    California no longer recognizes the defense of "diminished capacity." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) However, it does recognize "diminished actuality," which is the "actual failure to form a specific intent." (*People v. Mills* (2012) 55 Cal.4th 663, 671.) "To support a defense of 'diminished actuality,' a defendant presents evidence of voluntary intoxication or mental condition to show he 'actually' lacked the mental states required for the crime. [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 880, fn. 3.)

[9]    Appellant notes in his opening brief that his trial counsel never requested the court to instruct on the concept of attempted involuntary manslaughter. Appellant, however, contends that the court had a sua sponte obligation to provide this instruction.

Appellant argues that the trial court should have also instructed on the concept of attempted involuntary manslaughter.

We reject appellant's arguments. Instructional error did not occur because the crime of "attempted involuntary manslaughter" does not exist in California and nothing suggests the trial court should have informed the jury about such a concept.

Involuntary manslaughter is defined by statute as "the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In addition to these statutorily defined ways to commit involuntary manslaughter, a "nonstatutory form of the offense" exists. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.) The nonstatutory form involves a noninherently dangerous felony committed without due caution and circumspection. (*People v. Burroughs* (1984) 35 Cal.3d 824, 835–836.)

Involuntary manslaughter is generally a lesser included offense to murder. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) Thus, whenever substantial evidence shows that a defendant acted without conscious disregard for human life and did not form the intent to kill, a trial court should instruct the jury on involuntary manslaughter. (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 794.)

Contrary to the doctrine of involuntary manslaughter, California does not recognize the concept of *attempted* involuntary manslaughter. (See *People v. Brito* (1991) 232 Cal.App.3d 316, 321 [cases cited therein]; see also *People v. Broussard* (1977) 76 Cal.App.3d 193, 197.) An attempted crime requires specific intent. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710, citing § 21a.) This is true even if the underlying crime does not require a showing of specific intent. (*People v. Gutierrez*, *supra*, 112 Cal.App.4th at p. 710.) Attempted involuntary manslaughter is not a crime

14.

because one cannot intend to commit an unintentional killing.[10] (*People v. Johnson* (1996) 51 Cal.App.4th 1329, 1332.)

Appellant concedes that published opinions have already held that "attempted involuntary manslaughter" does not exist in California. He does not challenge those opinions or otherwise argue that they were wrongly decided. Instead, he relies on *People v. Brothers* (2015) 236 Cal.App.4th 24 (*Brothers*). This opinion does not assist him.

In *Brothers*, the defendant was convicted of voluntary manslaughter after she and her accomplices beat the victim, who died of asphyxiation after an accomplice shoved a large cloth gag down his throat. (*Brothers*, *supra*, 236 Cal.App.4th at pp. 26, 28.) On appeal, the defendant claimed that the trial court had erred in failing to instruct the jury sua sponte on involuntary manslaughter. (*Id.* at p. 26.) After an extensive review of applicable authorities, the *Brothers* court held that an instruction on involuntary manslaughter as a lesser included offense to murder must be given when reasonable doubt existed whether the defendant had held implied malice during an inherently dangerous assaultive felony. (*Id.* at pp. 33–34.) However, based on its facts, *Brothers* determined that an instruction on involuntary manslaughter had not been warranted, even when crediting the defendant's trial testimony. Instead, she had engaged in a deliberate and deadly assault. There was no evidence of an accidental killing or gross negligence. There was no evidence that the defendant had lacked a subjective understanding of the risk posed to the victim's life. (*Id.* at p. 34.) The judgment was affirmed. (*Id.* at p. 36.)

Appellant concedes that *Brothers* did not address whether *attempted* involuntary manslaughter is a crime in California, but he argues that its reasoning nevertheless supports his position. He contends that, in shooting his wife, he committed a

---

**10** The elements of attempted murder are: (1) the defendant took at least one direct but ineffective step toward killing another person; and (2) the defendant specifically intended to kill that person. (CALCRIM No. 600; see also *People v. Guerra* (1985) 40 Cal.3d 377, 386 [specific intent to kill is required for attempted murder].)

15.

"nonmalicious felony assault" that only required a showing of general criminal intent.[11] He notes that, when a defendant is charged with murder but could not form the intent to unlawfully kill due to a mental illness (and there is no evidence of implied malice), the defendant must either be acquitted or found guilty only of involuntary manslaughter. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1117.) He maintains that attempted nonstatutory involuntary manslaughter should be deemed a lesser included offense of attempted murder when a defendant can show diminished actuality. Appellant's position is without merit.

As an initial matter, *Brothers* is wholly inapposite to the present situation because it did not analyze or address attempted involuntary manslaughter. Cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.) In any event, we reject appellant's assertion that substantial evidence obligated the trial court to instruct the jury on the concept of attempted involuntary manslaughter. Viewing the facts in the light most favorable to appellant, the evidence overwhelmingly demonstrated that he was aware of his actions when he fired multiple shots at his wife. He admitted to a responding officer at the crime scene that he had just shot his wife three times, and he expressed concern about her health. Appellant acknowledged that he and his wife were going through a "bitter divorce." He told the officer that his daughter had knocked him down, and appellant stated that his daughter's actions had probably saved his wife's life. He stated to the officer that he was going to get the death penalty if she died, and that was okay because "I deserve it." At trial, Terrell informed the jury that, although appellant was mentally ill when this shooting occurred, he had known he was shooting his wife, appellant had known that his actions

---

[11]   Assault with a firearm is a general intent crime. (*People v. Thornton* (2007) 41 Cal.4th 391, 440.)

16.

were wrong, and appellant had known that his actions could have resulted in his wife's death.

*Brothers* in no way establishes that the trial court had a sua sponte duty to instruct appellant's jury on the unrecognized concept of attempted involuntary manslaughter. Nothing in this record shows that appellant accidentally shot his wife or that he acted with gross negligence. No evidence reasonably demonstrates that he failed to understand subjectively that he was posing a serious risk to her life when he pointed a loaded gun at her at relatively close range and repeatedly fired at her torso.

Because the crime of attempted involuntary manslaughter does not exist in California, the trial court did not err when it failed to instruct the jury on such a concept, and nothing from this record establishes or even reasonably suggests that the court should have fashioned such an instruction in this situation. Appellant intentionally committed an inherently dangerous felony that could easily have resulted in death. Consequently, instructional error did not occur and this claim fails.[12]

## II.     The Trial Court did not Err in Refusing to Instruct the Jury Regarding Involuntary Intoxication.

Appellant argues that the trial court erred in denying his request to instruct the jury on the defense of involuntary intoxication.

### A.     Background.

At trial, appellant's counsel requested the court to instruct the jury on both voluntary and involuntary intoxication. The court stated it did not see any evidence of involuntary intoxication because, whatever medication appellant ingested, the record was unclear regarding how much he took "and he didn't ingest it unknowingly." The court stated its belief that involuntary intoxication exists if a person ingests a substance through force, duress, fraud or trickery, and those requirements were not present in appellant's

---

[12]     Because the trial court did not err, we do not address appellant's arguments regarding alleged prejudice.

situation.[13]  The court stated it would give an instruction on voluntary intoxication but it refused to instruct the jury on the defense of involuntary intoxication.

### B.  Standard of review.

We review de novo the trial court's denial of the request to give a particular jury instruction.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)  The question is whether substantial evidence supported the requested instruction.  (*People v. Panah* (2005) 35 Cal.4th 395, 484.)  Substantial evidence is that which is sufficient for a reasonable jury to find in favor of the defendant.  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  In determining whether the evidence is sufficient to warrant a jury instruction, a court does not weigh credibility, but only asks whether evidence exists which, if believed by the jury, was sufficient to raise a reasonable doubt.  (*Id.* at pp. 982–983.)

### C.  Analysis.

In raising this claim, appellant notes that he was prescribed Klonopin on the day of the shooting, and he took it.  At trial, Terrell explained that Klonopin can "disinhibit" people by affecting their ability to restrain themselves from doing things that they would not normally do, including acts of violence.  Terrell found it significant that appellant acted violently shortly after taking this medication.  Based on this evidence, appellant contends that the trial court erred in failing to instruct on involuntary intoxication.  According to appellant, his ingestion of a prescription medication without knowing all possible intoxicating effects constituted substantial evidence to support this instruction.

---

[13]  CALCRIM No. 3427 states:  "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when (he/she) acted.

"A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the (force/[, [or] duress/, [or] fraud/, [or] trickery of someone else), for whatever purpose[, without any fault on the part of the intoxicated person]."

He asserts that this alleged instructional error was prejudicial, requiring reversal of his convictions.

Appellant's arguments are unpersuasive. Substantial evidence did not support this instruction, and any presumed error is harmless.

### 1. Substantial evidence did not support an instruction on involuntary intoxication.

Our Supreme Court has stated that involuntary intoxication may result from the ingestion of a prescription medication if the defendant "was unaware of a potentially intoxicating and rare drug interaction." (*People v. Nieves* (2021) 11 Cal.5th 404, 464.) Our high court has also held that involuntary intoxication can be caused by the voluntary ingestion of a prescription medication if the person did not know, or have reason to anticipate, its intoxicating effects. (*People v. Baker* (1954) 42 Cal.2d 550, 575.) Intoxication under that circumstance is involuntary because the defendant made an innocent mistake. (*People v. Chaffey* (1994) 25 Cal.App.4th 852, 856.)

Here, substantial evidence did not support an instruction on involuntary intoxication. The evidence overwhelmingly showed that appellant voluntarily took Klonopin. Although Terrell testified that Klonopin can "disinhibit" people after taking it, there was no evidence that appellant ingested this drug without knowing its potential side effects. There was no evidence regarding what warnings, if any, he received about this drug. In addition, nothing established or even reasonably implied that appellant suffered a "rare drug interaction" when he took Klonopin on the day of this shooting. Indeed, no evidence was introduced in this trial regarding appellant's blood toxicology or how Klonopin actually impacted him. Thus, nothing reasonably demonstrated or even suggested that appellant took a prescription medication that caused an unknown or unanticipated intoxicating effect.

Finally, in arguing that error occurred, appellant contends that the trial court erroneously focused on the fact that appellant was not forced to take Klonopin.

19.

According to appellant, the court employed an incorrect analysis when it denied the requested instruction. We disagree that this concern establishes that reversal is required. Based on our independent review, an involuntary intoxication instruction was not appropriate. Thus, although the court stated a different rationale for its denial, error did not occur because we review the court's ruling and not its reasoning. (*People v. Geier* (2007) 41 Cal.4th 555, 582.) We affirm if the ruling was correct on any ground. (*Ibid.*)

Based on this record, instructional error did not occur when the court denied appellant's request to instruct the jury on the defense of involuntary intoxication. Substantial evidence did not support such an instruction. As such, this claim is without merit.[14] In any event, however, we also determine that any presumed error is harmless.

### 2. *Any presumed error is harmless.*

The parties disagree on the appropriate standard of review to analyze prejudice in this situation. Appellant primarily contends that we should analyze prejudice under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under *Chapman*, the beneficiary of the error must prove beyond a reasonable doubt that it did not contribute to the jury's verdict. (*Id.* at p. 24.) In contrast, respondent primarily asserts that we should rely on *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under *Watson*, the question is whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. (*Id.* at p. 836.)

---

[14]     In his opening brief, appellant states in passing that "it would have been appropriate" for the trial court to instruct the jury on the doctrine of unconsciousness due to involuntary intoxication. In his reply brief, however, appellant makes it clear that he is not arguing that the trial court erred by failing to give such an instruction. Instead, appellant contends that, if the court had instructed on involuntary manslaughter, it may also have instructed on unconsciousness caused by involuntary intoxication. As such, we do not address whether the trial court should have instructed on the doctrine of unconsciousness.

We need not resolve the appropriate standard of review in this situation. Instead, we can declare that, under any standard, any presumed error was harmless. The jury found true that, in committing attempted murder, appellant personally and intentionally discharged a firearm which proximately caused great bodily injury to his wife. The jury also concluded that appellant had premeditated in his attempt to kill her. The evidence overwhelmingly demonstrated that appellant knew he was shooting his wife, that he planned for her death in advance, and he intended her death.

Appellant retrieved his firearms a day or two before this shooting. Appellant told detectives that he began planning to shoot his wife after he drove past D.J.'s house. He went home, fed himself and the dogs, and returned to D.J.'s house with his firearms. Appellant said he was "thinking all day" that he should "just kill the fucking bitch." He said he "just kept hearing that I should kill her." He explained that, when he drove back to D.J.'s residence, he parked down the street and he walked towards the residence.

Appellant told multiple law enforcement officials, both immediately after this crime and during his formal interview, that he had shot his wife and his daughter had saved his wife's life when she knocked him down from behind. At the crime scene, he stated that he was going to get the death penalty if his wife died, and that was okay because "I deserve it." Appellant told detectives that he "knew what [he] was doing" when he shot his wife, but he did not care.

At trial, Terrell informed the jury that, although appellant was mentally ill when this shooting occurred, appellant had known he was shooting his wife. Terrell opined that appellant had known that his actions were wrong, and appellant had known that his actions could have resulted in his wife's death.

We reject appellant's position that his intent to kill was susceptible to reasonable doubt. To the contrary, the evidence overwhelmingly and conclusively established his intent to kill. Based on this record, we can declare beyond any reasonable doubt that any alleged error in failing to instruct the jury on involuntary intoxication was

21.

overwhelmingly harmless. (See *Chapman*, *supra*, 386 U.S. at p. 24.) Likewise, it is not reasonably probable the verdict would have been more favorable to appellant absent this alleged instructional error. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Consequently, prejudice is not present under either standard and reversal is not warranted.[15]

## III. Instructional Error Did Not Occur Regarding Voluntary Intoxication and any Presumed Error is Harmless.

Appellant asserts that the trial court committed reversible error by failing to instruct the jury "fully and correctly" regarding the doctrine of voluntary intoxication. He contends that his conviction in count 1 for attempted premeditated murder must be reversed.

### A. Background.

Based on CALCRIM No. 3426, the trial court gave a modified instruction to the jury regarding voluntary intoxication. The jurors were told that they could consider any evidence of intoxication only in deciding whether appellant "acted with a specific intent required in Count One." The jurors were informed that the prosecution had the burden of proving beyond a reasonable doubt that appellant had acted "with the intent to kill and/or with deliberation and premeditation." The jurors were instructed to find appellant not guilty in count 1 if the prosecution did not meet this burden.

When the trial court instructed the jury with a modified version of CALCRIM No. 3426, it purposefully declined to inform the jurors to consider whether appellant

---

**15** Appellant notes that the jury deliberated "for slightly over two hours over the course of two days before reaching its verdicts." According to appellant, this suggests that at least one juror was entertaining doubts about whether appellant had acted with the intent to kill. We disagree. The record overwhelmingly established that appellant acted with intent to kill and these deliberations were not particularly lengthy. In any event even if the deliberations could be characterized as lengthy, that could also be reconciled as showing that the jury conscientiously performed its civic duty. (*People v. Walker* (1995) 31 Cal.App.4th 432, 439.)

became intoxicated from an "intoxicating drug."[16]  According to the court, medications are not themselves intoxicating, but they can have an intoxicating effect.

Defense counsel stated he was "okay" with the trial court's instruction as modified.

### B.    Standard of review.

We review de novo a claim of instructional error.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  To resolve such a claim, we must examine the challenged instruction in the context of the entire jury instructions and the trial record to determine if there is a reasonable likelihood the jury applied the instruction in an impermissible manner.  (*Ibid*.)  We must ascertain the relevant law and determine whether the given instruction correctly stated it.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526.)

---

**16**      CALCRIM No. 3426 reads as follows.  We highlight in bold the word that the trial court purposefully omitted:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with _____ *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that …' or 'the intent to do the act required'>*.

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any **intoxicating** drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"In connection with the charge of _____ *<insert first charged offense requiring specific intent or mental state>* the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with _____ *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that …'>*.  If the People have not met this burden, you must find the defendant not guilty of _____ *<insert first charged offense requiring specific intent or mental state>*.

"*<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>*

"You may not consider evidence of voluntary intoxication for any other purpose. [Voluntary intoxication is not a defense to _____ *<insert general intent offense[s]>*.]"

### C. Analysis.

Appellant argues that the trial court failed to give "a correct and complete instruction" regarding voluntary intoxication. He raises three concerns. First, the court should have expressly told the jurors to consider intoxication regarding both his intent to kill, and regarding deliberation and premeditation. He asserts that the court was too vague when it told the jurors to consider evidence of intoxication regarding his "specific intent" in count 1. Second, appellant contends that the court should have not removed the word "intoxicating" before the phrase "any drug, drink or other substance" in the second paragraph of CALCRIM No. 3426. Finally, appellant argues that the court expressly failed to inform the jurors to consider intoxication regarding the lesser included offense of attempted voluntary manslaughter.

We reject appellant's arguments. This claim is forfeited and it also fails on its merits. We further conclude that any presumed error is harmless.

#### 1. Appellant has forfeited this claim.

The parties dispute whether or not appellant has forfeited this claim. Respondent asserts that, because appellant not only failed to object to the instruction but agreed to the modifications, forfeiture should apply.

Appellant concedes that his trial counsel did not object to the modified version of CALCRIM No. 3426 which the court provided, and defense counsel did not request any additional modifications. However, appellant contends that we should reach the merits of this claim. According to appellant, his substantial rights were impacted by the allegedly deficient instruction. (See § 1259 [an appellate court may review "any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].) In the alternative, appellant raises a claim of ineffective assistance of counsel.

We agree with respondent that this claim is forfeited. Appellant did not object to the proposed language which the trial court stated it would use with CALCRIM No.

3426, and appellant did not request any modification. Thus, he "may not be heard now." (*People v. Guiuan, supra,* 18 Cal.4th at p. 570.) In any event, we also reject this claim on its merits.[17]

### 2.       *Instructional error did not occur.*

We reject appellant's assertion that instructional error occurred regarding voluntary intoxication under CALCRIM No. 3426. Evidence of voluntary intoxication is admissible regarding whether or not a defendant "actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).)

Here, the trial court specifically told the jurors to consider any evidence of voluntary intoxication in deciding whether appellant "acted with a specific intent required in Count One." The jurors were informed that the prosecution had the burden of proving beyond a reasonable doubt that appellant had acted "with the intent to kill and/or with deliberation and premeditation." The jurors were instructed to find appellant not guilty in count 1 if the prosecution did not meet this burden.

Through other instructions, the court made it clear that the prosecution was required to prove that appellant had intended to kill in order to establish appellant's guilt for attempted murder in count 1. The jurors were informed that, if they found appellant guilty of attempted murder, they then must decide if the prosecution had proven the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. The jurors were told that an attempted killing that would otherwise be attempted murder is reduced to voluntary manslaughter if appellant attempted to kill

---

**17**       Because we also address and reject this claim on its merits, we need not address any alleged ineffective assistance of counsel because appellant cannot show he was prejudiced by his trial counsel's performance. (See *People v. Holt* (1997) 15 Cal.4th 619, 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].) Likewise, because instructional error did not occur, appellant's "substantial rights" were not violated.

someone because of a sudden quarrel or in the heat of passion. The elements for heat of passion and the relevant legal terms were defined for the jury. The court stated that the prosecution bore the burden of proving beyond a reasonable doubt that appellant intended to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion. If it did not meet this burden, the jurors were told that they must find appellant not guilty of attempted murder.

During closing arguments, appellant's trial counsel took the position that appellant had acted due to a psychotic mental disorder and the prosecution had not proven beyond a reasonable doubt that he had acted with deliberation and premeditation. Defense counsel reminded the jurors that appellant had taken a new medication on the day of this shooting, and Terrell had testified that this medication could lower a person's inhabitations. Defense counsel stated that this medication "most definitely" was a defense in this case. The defense asserted that appellant's conduct could be "excused" because he took the medication. According to the defense, appellant took it voluntarily "but he did not appreciate the risk or how the medication would make him feel which, of course, would explain why he did what he did on that night." Defense counsel argued that the prosecution could not prove deliberation and premeditation beyond a reasonable doubt, and he asked the jury to find appellant not guilty in count 1.

Based on this record, nothing establishes or even reasonably indicates that the jury would have not understood it could find appellant not guilty in count 1 of the charged crime, including attempted voluntary manslaughter, if it had believed appellant had lacked an intent to kill based on voluntary intoxication. The jury was told to consider appellant's intoxication based on his voluntary ingestion of the prescription medication. Thus, it is not reasonably likely the jury applied CALCRIM No. 3426 in an impermissible manner. The totality of this record does not support appellant's claim of instructional error and reversal is not warranted. In any event, we also conclude that any presumed error was harmless.

26.

### 3. *Any presumed error is harmless.*

Appellant asserts that the incomplete version of CALCRIM No. 3426 "effectively precluded the jury" from considering his intoxication in determining if he was guilty of the lesser included offense of attempted voluntary manslaughter based on a heat of passion. He also maintains that jurors may not have realized they could consider evidence of his intoxication in determining if he had acted with an intent to kill, and/or with deliberation and premeditation. He contends that, based on the alleged instructional error, he was unable to present a full defense regarding his voluntary intoxication. He contends that reversal is required under the federal standard of *Chapman*. In the alternative, he argues that reversal is required even under the state *Watson* standard.

We disagree that reversal is warranted under either standard even if instructional error is presumed regarding voluntary intoxication. Overwhelming evidence established appellant's intent to kill and the defense never asked the jury during closing argument to consider attempted voluntary manslaughter. Instead, it was the defense's position that appellant was not guilty in count 1 based on his use of medication because the prosecution could not prove beyond a reasonable doubt that appellant had acted with deliberation and premeditation. Based on the verdict rendered in count 1, however, the jury clearly rejected the defense's position. The jury found that appellant intended to kill his wife, and he did so with deliberation and premeditation. The jury also found true that appellant intentionally discharged a firearm which caused her great bodily injury.

Based on this record, we can declare beyond any reasonable doubt that any alleged instructional error regarding voluntary intoxication was overwhelmingly harmless. (See *Chapman*, *supra*, 386 U.S. at p. 24.) Likewise, it is not reasonably probable the verdict would have been more favorable to appellant absent this alleged instructional error. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Therefore, even if instructional error occurred regarding voluntary intoxication, prejudice is not present under either applicable standard, and this claim fails.

27.

**IV.     Cumulative Error Did Not Occur and any Presumed Error is Harmless.**

Appellant maintains that, based on the totality of alleged multiple errors, his conviction for attempted premeditated murder must be reversed.  He contends that the jury was confused so that he did not receive a fair trial and his due process rights were violated.

**A.     *Appellant's specific concerns underlying his claim of cumulative error.***

In raising this claim, appellant again asserts that the jury was not fully and correctly instructed regarding the defense of voluntary intoxication.  He also raises four new alleged errors, which we summarize.

**1.     *The instruction regarding hallucinations.***

The trial court instructed the jury to consider evidence of appellant's hallucinations, if any, in deciding if appellant acted with deliberation and premeditation. The court told the jurors that, if the People did not prove this allegation, they must find appellant not guilty of "first-degree *attempted* murder."  (Italics added.)  However, the written instruction given to the jury (CALCRIM No. 627) did not contain the word "attempted" so the jurors were instructed in writing to consider any evidence of hallucination for "first degree murder."  Appellant argues it is presumed that the jury followed the written instruction and not the court's verbal one.  Based on that presumption, he contends that the jurors would have not known to consider evidence of his hallucinations in determining whether he had acted with premeditation and deliberation regarding the charge of *attempted* murder in count 1.

**2.     *The instruction regarding mental disease, defect or disorder.***

With CALCRIM No. 3428,[18] the jurors were instructed that they had heard evidence that appellant may have suffered from a mental disease, defect or disorder.  The

---

[18]     The form version of CALCRIM No. 3428 states:

"You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder).  You may consider this evidence only for the

28.

jurors were told that they could consider this evidence only for the limited purpose of deciding whether, at the time of the crime, appellant had "acted with the intent or mental state required" for a crime. When giving this instruction, the court informed the jurors that the prosecution bore the burden of proving beyond a reasonable doubt that appellant had acted with "an intent to kill" and to premeditate and deliberate. If that burden was not met, the jury was instructed that it must find appellant not guilty in count 1.

Appellant argues that the instruction given under CALCRIM No. 3428 did not specifically delineate that the jury could consider his mental illness for each of the attempted homicide offenses in count 1. Appellant particularly contends that this instruction did not inform the jurors to consider his mental illness for the special allegation of premeditation and deliberation, and the lesser included charge of attempted voluntary manslaughter.

### 3. *Referring to attempted murder as either "first-degree" or "second-degree."*

At trial, the prosecutor and the court sometimes referred to the charge of attempted murder as either "first-degree" or "second-degree" attempted murder throughout the instructions and closing arguments. The verdict forms did not ask the jury to make a

---

limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: _____ *<insert specific intent or mental state required, e.g., 'malice aforethought,' 'the intent to permanently deprive the owner of his or her property,' or "knowledge that …'>*. If the People have not met this burden, you must find the defendant not guilty of _____ *<insert name of alleged offense>.*

"*<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>*

"[Do not consider evidence of mental (disease[,]/ [or] defect[,]/ [or] disorder) when deciding if _____*<insert name of nontarget offense>* was a natural and probable consequence of _____ *<insert name of target offense>.*]"

29.

separate true finding regarding premeditation and deliberation.  Instead, the jury returned a guilty verdict in count 1 for "ATTEMPTED WILLFUL, DELIBERATE, PREMEDITATED MURDER" as charged in count 1.  Another verdict form permitted the jury to find appellant guilty of "ATTEMPTED SECOND DEGREE MURDER" as a lesser included offense in count 1.

Appellant asserts that referring to "first-degree" and "second-degree" attempted murder at trial was error and confusing because attempted murder is not divided into degrees.

### 4. The court and the prosecutor told the jury the order on how to fill out the verdict forms.

Both the prosecutor and the court gave directions to the jury regarding how to fill out the verdict forms.  We summarize those relevant comments.

### a. The prosecutor's disputed statements.

At the end of the prosecutor's initial closing argument, she reviewed the verdict forms with the jury.  She told the jurors that, if they believed appellant was guilty of attempted murder with premeditation, they should sign the first verdict form without going to the other verdict forms regarding the lesser included offenses for count 1.  The prosecutor further stated that, if the jurors decided that appellant was not guilty in count 1, then they should move to the lesser included offenses.  She stated that "[a]ttempted second-degree murder is a lesser-included offense of attempted first degree," and the difference was a lack of premeditation or deliberation.  The prosecutor stated that, if the jurors found appellant not guilty of attempted murder, then they should consider attempted voluntary manslaughter.  Finally, the prosecutor asserted that the jury could consider assault with a firearm in count 1 "after you've gone through all of those other verdict forms."

### b.     The court's disputed statements.

At the conclusion of the jury instructions, the court explained how the jurors should fill out the verdict forms. The court stated that, if the jurors found appellant not guilty of attempted murder without premeditation and deliberation, then they could consider attempted voluntary manslaughter. The court said that, if the jurors found appellant not guilty of that charge, then they could consider assault with a firearm.

Appellant argues that the court's and prosecutor's comments were in error because jurors are free to consider and discuss the greater and lesser offenses in any order. Appellant contends that the court and the prosecutor improperly directed the jurors on how to consider the charges.

### B.     Analysis.

Appellant makes it clear in his reply brief that he is not raising these alleged errors individually, but only collectively. Based on all of the concerns summarized above, appellant maintains that "the jury did not know exactly what it was being asked to decide." He argues that the cumulative effect of these alleged errors may have resulted in the jury failing to consider the lesser included offenses. He contends that he did not receive a fair trial and the jury did not know how to consider the evidence of his mental disease, hallucinations and intoxication. He asserts that substantial evidence showed he was suffering from a mental disease and he was experiencing "auditory command hallucinations" telling him to kill his wife. He argues that he may have shot his wife in a heat of passion because he believed she was having an affair. Based on *Chapman*, he seeks reversal of his conviction in count 1.

31.

We disagree that reversal of count 1 is warranted based on these alleged errors.[19] Cumulative error did not occur and any presumed error is harmless.[20]

### 1. Appellant's due process rights were not violated.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

Here, appellant received a fair trial. Although the written instruction provided to the jury regarding hallucination (CALCRIM No. 627) only referred to murder, it is apparent from the totality of this record that the jury would have understood it could use evidence of appellant's claimed auditory hallucinations in determining his guilt for *attempted* murder. Appellant was not charged with murder. It was undisputed that appellant had shot his wife, who had lived. The court verbally told the jury to consider this defense to the charge of attempted murder. Thus, there is no reasonable likelihood the jury would have been confused.

Regarding appellant's mental disease, defect or disorder (CALCRIM No. 3428), it is likewise clear that the jury would have understood it could consider appellant's mental illness for each of the attempted homicide offenses. The court told the jury to consider appellant's mental health when deciding if appellant had "acted with the intent or mental state required" for a crime. The court stated that the prosecution bore the burden of proving beyond a reasonable doubt that appellant had acted with "an intent to kill" and to

---

[19] We do not again address appellant's assertion that the jury was not fully and correctly instructed regarding voluntary intoxication, which we rejected earlier in this opinion.

[20] Because this claim fails on its merits, we need not resolve the parties' disputed arguments regarding forfeiture or ineffective assistance of counsel.

premeditate and deliberate. If that burden was not met, the jury was instructed that it must find appellant not guilty in count 1. With other instructions, the jury was told that both attempted murder and attempted voluntary manslaughter required an intent to kill. The jury was instructed that an attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if appellant attempted to kill because of a sudden quarrel or in the heat of passion.[21] Based on the totality of the instructions, no error occurred. It is readily apparent that the jury would have understood it could consider appellant's mental health when deciding his guilt in count 1, including attempted voluntary manslaughter.

We agree with appellant that attempted murder is not divided into degrees. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1228.) However, we reject appellant's contention that, because the prosecutor and the court sometimes referred to the charge of attempted murder as either "first-degree" or "second-degree" throughout the instructions and closing argument, the jury would have been confused. Instead, both the court and the prosecutor made it abundantly clear that the prosecution had to prove appellant's intent to kill, and the prosecution had to prove that he premeditated and deliberated. Although the verdict form did not ask the jury to make a separate true finding regarding premeditation and deliberation, the jury had other options available to it, but it returned a guilty verdict in count 1 for "ATTEMPTED WILLFUL, DELIBERATE, PREMEDITATED MURDER." This record neither establishes nor reasonably suggests that the jury might have misapplied the law.

---

[21] The jury was also instructed in count 1 that it could find appellant guilty of assault with a firearm as a lesser included offense of attempted murder. Appellant correctly notes that assault with a firearm is not a lesser included offense to attempted murder. (*People v. Parks* (2004) 118 Cal.App.4th 1, 6.) However, appellant does not contend that this was reversible error.

33.

Finally, we reject appellant's assertion that the trial court and the prosecutor directed the jurors regarding how to consider the charges. When read in context, both the court and the prosecutor were discussing how the jury should fill out the verdict forms following their deliberations. "Under the acquittal-first rule, a trial court may direct the order in which jury verdicts are returned by requiring an express acquittal on the charged crime before a verdict may be returned on a lesser included offense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) Thus, we discern no error. Moreover, with CALCRIM No. 3517, the court specifically informed the jurors that they could determine the order in which they deliberated each charge. As such, this record does not show or even reasonably suggest that the jurors may have believed they were restrained regarding the order of deliberations.

This record overwhelmingly establishes that appellant received a fair trial and the jury knew what was asked of them. The court properly instructed the jury that the prosecution bore the burden of proving appellant's guilt beyond a reasonable doubt, and the prosecution had to prove appellant's intent to kill. The jury was instructed that it could find appellant guilty of attempted voluntary manslaughter if appellant had acted under a heat of passion. The defense, however, never argued to the jurors that appellant had acted under a heat of passion and the defense never asked the jury to find appellant guilty of attempted voluntary manslaughter. Instead, the defense asserted that appellant could not have planned this crime, and he did not premeditate or deliberate because he was psychotic. Appellant's trial counsel referenced the hallucination instruction during closing argument, and counsel reminded the jurors that appellant had told Terrell that he had been hearing voices. The defense maintained that, based on voluntary intoxication, appellant's conduct "could have been excused" because he took medication. According to the defense, appellant "did not appreciate the risk or how the medication would make him feel which, of course, would explain why he did what he did on that night." The

defense asserted that the prosecution could not prove deliberation and premeditation beyond a reasonable doubt, and appellant was not guilty in count 1.

It is apparent that appellant was able to present his complete defense to the jury. His claim of cumulative error is without merit because we have rejected all of his individual claims.  (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [the defendant's cumulative prejudice argument rejected based on findings each individual contention lacked merit or did not result in prejudice].)  Taking all of appellant's arguments into account, we are satisfied that he received a fair adjudication. Consequently, his due process rights were not violated and reversal is not warranted.

### 2. *Any presumed error is harmless.*

Even if presumed error occurred, we reject appellant's assertion that reversal is required under *Chapman*.  In light of the jury's verdicts and true findings, it is overwhelmingly apparent that the jurors rejected appellant's position that he had lacked a specific intent to kill, or that he could not premeditate and deliberate.  The prosecution conclusively and overwhelmingly established appellant's intent to kill, and that he had premeditated and deliberated before shooting his wife multiple times.  Based on this record, we can declare beyond any reasonable doubt that any alleged errors underlying this claim were overwhelmingly harmless, whether viewed individually or collectively. (See *Chapman*, *supra*, 386 U.S. at p. 24.)  Consequently, appellant's various arguments are unpersuasive and this claim fails.

### V. Appellant has Forfeited his *Dueñas*-related claim Regarding the Imposition of Restitution Fines; in any Event, Appellant did not Suffer a Due Process Violation and the Trial Court did not Abuse its Discretion in Imposing Certain Fines and Assessments.

Appellant contends the trial court abused its discretion and violated his due process rights by imposing upon him certain restitution fines and assessment fees. Appellant rests his claim primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

35.

## A.    Background.

At the time of sentencing, appellant was approximately 68 years old, he was five feet eight inches tall and weighed 290 pounds.  The trial evidence established that appellant has numerous medical issues, including high blood pressure and back pain.  The probation report indicated that appellant suffers from diabetes, sleep apnea, and he had "[s]evere mobility problems."  Appellant had apparently suffered a broken back about three years prior after falling while in jail.  Appellant had suffered a stroke in jail at or around the same time.  The report indicates that appellant was prescribed "15 to 20 medications" and, prior to his arrest, he was prescribed medical marijuana.

At sentencing, the trial court imposed upon appellant (in part) a $1,000 restitution fine (§ 1202.4, subd. (b)(1)); a matching parole revocation fine (§ 1202.45); an $80 court operations assessment (§ 1465.8, subd. (a)(1)); and a $60 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)).

During the sentencing hearing, appellant's trial counsel objected to the imposition of some of these financial obligations based on appellant's inability to earn wages.  The probation department had recommended that the court should impose a restitution fine of $9,600.  The court noted that appellant would likely not be productive in prison "in any meaningful sense."  The court stated it would impose a "minimum" restitution fine of $1,000.  The court waived the cost of the probation report, and it waived reimbursement to the County for the services rendered of the court-appointed counsel.  The court noted that appellant's retirement benefits were being paid to his wife, the victim in this case.

## B.    Analysis.

Appellant argues that the trial court "essentially found" that he lacked the ability to pay, but the court apparently was not aware that $300, and not $1,000, is the minimum restitution fine.  Appellant contends he is indigent and the court abused its discretion and violated his due process rights by imposing the financial obligations.  Appellant maintains that, although his crime was very serious, he suffers from mental health issues,

his wife is receiving his retirement benefits, and he has no opportunity for future employment. He wants the assessment fees struck, and the restitution fines reduced to the statutory minimum of $300 and stayed unless and until it is proven that he has the ability to pay.

We reject appellant's arguments. We agree with respondent that appellant has forfeited this claim regarding the restitution fines. We further hold that *Dueñas* is distinguishable from appellant's situation, and appellant's constitutional rights were not violated. Finally, we conclude that the trial court did not abuse its discretion.

### 1. *Appellant has forfeited this claim regarding the restitution fines*.

Respondent contends that appellant has forfeited this claim regarding the imposed restitution fines. We agree.

Section 1202.4, subdivision (b)(1), requires a court to impose a restitution fine in an amount not less than $300 and not more than $10,000 in every case where a person is convicted of a felony unless it finds compelling and extraordinary reasons not to do so. Section 1202.4, subdivision (c), specifies a defendant's inability to pay is not a compelling and extraordinary reason to refuse to impose the fine, but inability to pay "may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $300]." While the defendant bears the burden of demonstrating his or her inability to pay, a separate hearing for the restitution fine is not required. (§ 1202.4, subd. (d).) "Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)

Here, the probation department recommended restitution fines of $9,600. Although appellant objected at sentencing to the imposition of certain assessments, appellant's trial counsel did not address the amount of the restitution fines, a point which appellant concedes in his opening brief.

Appellant had a statutory right and he was obligated to object to the imposition of a restitution fine above the $300 minimum. (§ 1202.4, subd. (c) [inability to pay may be considered when the restitution fine is increased above the minimum].) A factual determination was required regarding his alleged inability to pay. (See *People v. Frandsen*, *supra*, 33 Cal.App.5th at p. 1153.) Thus, such an objection would not have been futile under governing law when appellant was resentenced. (*Id.* at p. 1154.) We stand by the traditional rule a party must raise an issue in the trial court if he or she wants appellate review. (*Id.* at p. 1155.) Consequently, appellant has forfeited this claim regarding the $1,000 restitution fine (§ 1202.4, subd. (b)(1)) and the matching parole revocation fine (§ 1202.45). (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1054 (*Lowery*).) In any event, even if forfeiture did not occur, we reject all of his arguments on their merits.[22]

### 2. Unlike the probationer in Dueñas, appellant's due process rights were not violated and Dueñas is not applicable.

In multiple opinions, this court has written extensively about *Dueñas*. (See, e.g., *People v. Montes* (2021) 59 Cal.App.5th 1107; *People v. Son* (2020) 49 Cal.App.5th 565; *Lowery*, *supra*, 43 Cal.App.5th 1046; *People v. Aviles* (2019) 39 Cal.App.5th 1055.) The defendant in *Dueñas* had cerebral palsy, which caused her to drop out of high school and left her unemployed. Her husband was also unemployed, although occasionally he was able to obtain short-term work in construction. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.) The defendant lost her driver's license because she was too poor to pay juvenile citations. (*Id.* at p. 1161.) She continued to offend because aggregating criminal conviction assessments and fines prevented her from recovering her license. (*Ibid.*) The

---

[22] Because we also address and reject this claim on its merits, we need not address appellant's claim of alleged ineffective assistance of counsel. Because this claim fails on its merits, appellant cannot show he was prejudiced by his trial counsel's performance. (See *People v. Holt*, *supra*, 15 Cal.4th at p. 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

*Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Id.* at pp. 1163–1164.) The *Dueñas* court concluded the defendant faced ongoing unintended punitive consequences because of the imposed financial obligations. *Dueñas* determined those unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process.[23] (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)

The *Dueñas* court concluded that due process requires a trial court to conduct an ability to pay hearing, and ascertain a defendant's present ability to pay, before it imposes certain assessments under section 1465.8 and Government Code section 70373. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) *Dueñas* also held that, although section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine.[24] (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

---

**23** The *Dueñas* court noted that the imposed financial obligations were also potentially unconstitutional under the excessive fines clause of the Eighth Amendment of the United States Constitution. However, *Dueñas* stated, "[t]he due process and excessive fines analyses are sufficiently similar that the California Supreme Court has observed that '[i]t makes no difference whether we examine the issue as an excessive fine or a violation of due process.'" (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1171, fn. 8.)

**24** A different panel of the same court that decided *Dueñas* rejected the argument that *Dueñas* places a burden on the People to prove a defendant's ability to pay in the first instance. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489–490 (*Castellano*).) *Castellano* clarifies that the defendant in *Dueñas* had demonstrated her inability to pay in the trial court and, only in that circumstance, had the appellate court concluded fees and assessments could not constitutionally be assessed and restitution must be stayed until the People proved ability to pay. (*Castellano*, *supra*, at p. 490.) Thus, "a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court." (*Ibid.*)

Here, we decline to expand *Dueñas*'s holding beyond the unique facts found in *Dueñas*. Unlike the probationer in *Dueñas*, appellant does not establish the violation of a fundamental liberty interest. His incarceration was not a consequence of prior criminal assessments and fines. He was not deprived of liberty because of alleged indigency. He was not caught in a cycle of "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [his] poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163–1164.) Appellant could have avoided this criminal judgment and his incarceration regardless of his financial circumstances. *Dueñas* is distinguishable and it has no application in this matter. (See *Lowery*, *supra*, 43 Cal.App.5th at pp. 1054–1055.)

We agree with respondent that a criminal restitution fine, which does not impact a fundamental right, satisfies rational basis review. Appellant attempted to murder his wife. He shot a firearm multiple times at her, severely injuring her. Given the nature of appellant's senseless and violent act, the restitution fine imposed against him was reasonably related to a proper legislative goal. The State of California has a legitimate interest in punishing criminal behavior. Thus, the restitution fine imposed in this matter survives rational basis scrutiny. (See *Perkey v. Department of Motor Vehicles* (1986) 42 Cal.3d 185, 189 [under rational basis review, a law does not violate due process if its enactment is procedurally fair and reasonably related to a proper legislative goal].)

Finally, respondent concedes that due process is implicated when nonpunitive assessments (i.e., a court operations assessment or a criminal conviction assessment) are imposed on indigent defendants.[25] Respondent notes it does not seek to uphold imposition of nonpunitive assessments on those who cannot pay. Respondent, however,

---

**25** "A restitution fine ([Pen. Code,] § 1202.4, subd. (b)(1)) represents punishment. [Citation.] In contrast, a court operations assessment ([Pen. Code,] § 1465.8, subd. (a)(1)) and a criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) are not considered punishment. [Citations.]" (*Lowery*, *supra*, 43 Cal.App.5th at p. 1048, fn. 3.)

40.

asserts that any constitutional violation in this matter was harmless beyond a reasonable doubt. Respondent notes that the trial court impliedly determined that appellant could pay these assessments when it denied the defense request to disregard the recommendations from the probation department.

We disagree with respondent's suggestion that a constitutional violation may have occurred in this matter associated with the imposition of a court operations assessment of $80 (§ 1465.8, subd. (a)(1)) and/or a criminal conviction assessment of $60 (Gov. Code, § 70373, subd. (a)(1)). To the contrary, those nonpunitive obligations are not analogous to the imposition of court reporter fees on an indigent defendant. (See *Griffin v. Illinois* (1956) 351 U.S. 12, 18–20 (plur. opn. of Black, J.) [due process and equal protection require a state to provide criminal defendants with a free transcript for use on appeal].) Appellant was not incarcerated because he was unable to pay prior fees, fines or assessments. (See *Bearden v. Georgia* (1983) 461 U.S. 660, 672–673 [fundamental fairness is violated if a state does not consider alternatives to imprisonment if a probationer in good faith cannot pay a fine or restitution].) The imposition of the nonpunitive assessments in this matter did not deny appellant access to the courts, it did not prohibit him from presenting a defense, and it did not prevent him from pursuing his appellate claims. The probationer in *Dueñas* presented compelling evidence the imposed assessments *had resulted* in ongoing unintended punitive consequences. In contrast, although appellant could suffer any number of future unintended consequences, mere speculation does not establish a present constitutional infirmity. (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [hypothetical situations are insufficient to establish a statute is facially unconstitutional].) A law may not be held unconstitutional on its face "simply because those challenging the law may be able to hypothesize some instances in which application of the law might be unconstitutional." (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 347 (plur. opn. of George C., J.).) To establish facial unconstitutionality, a petitioner must demonstrate an act's

provisions " 'inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267.)

Based on this record, a substantive due process violation did not occur when the trial court imposed the restitution fine and the nonpunitive assessments in this matter. Appellant's incarceration was not based on his alleged indigency. Instead, he chose to engage in violent criminal behavior. We reject his due process challenge and the applicability of *Dueñas* in this matter.[26] (See *Lowery*, *supra*, 43 Cal.App.5th at pp. 1056–1057.)

### 3. The court did not abuse its discretion.

Appellant maintains that the court abused its discretion. According to appellant, the court impliedly found that he lacked the ability to pay any fines and fees, and the court decided to impose minimum restitution fines, but it mistakenly believed that such a fine was $1,000 and not $300. We disagree that an abuse of discretion occurred.

Absent a showing to the contrary, we presume that the trial court understood and followed the applicable law. (*People v. Braxton* (2004) 34 Cal.4th 798, 814; *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1264.) We also presume that the court properly exercised its sentencing discretion. (*People v. Weddington* (2016) 246 Cal.App.4th 468, 492.)

Here, we presume the court understood that $300, and not $1,000, is the statutory minimum fine under section 1202.4, and nothing reasonably rebuts that presumption. When imposing the restitution fine of $1,000, the court did not state it was intending to

---

**26** Respondent contends we should analyze appellant's *Dueñas* claim under the rubric of the excessive fines clause of the Eighth Amendment to the United States Constitution. Appellant does not respond to this argument, contending it was not part of his original claim. We agree with appellant that it is not appropriate to analyze appellant's claim under the excessive fines clause because appellant's constitutional challenge was based solely on due process.

impose the *statutory* minimum. Rather, the court stated it was imposing "a minimum" restitution fine after the probation department had recommended a restitution fine of $9,600. On the probation report, someone—presumably the court—struck that recommendation and handwrote "$1,000." The court signed the report, indicating it had read and considered it. The court's actions do not establish or even reasonably suggest that it did not understand the law. Instead, it overwhelmingly appears that the court simply intended to minimize the amount of restitution fines which the probation department had recommended. We reject appellant's assertion that the court failed to exercise its discretion knowingly.

This record amply supports the court's sentencing decisions. Given appellant's violent conduct and the totality of his situation, the court reasonably reduced the restitution fines from the recommended $9,600 to $1,000. Indeed, the imposed restitution fines are well within the parameters which the Legislature has recommended.[27] Regarding the $80 court operations assessment and the $60 criminal conviction assessment, we have already determined that appellant's due process rights were not violated and *Dueñas* is inapplicable. These assessments are statutorily mandatory for all criminal convictions. (See § 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1).) The court, however, waived the cost of the probation report, and it waived reimbursement to the County for the services rendered of the court-appointed counsel.

The court did not exercise its sentencing discretion regarding the imposed fines and assessments in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. Likewise, the court's ruling does not fall outside the

---

[27] By statute, a trial court may determine the amount of a restitution fine as the product of the minimum fine ($300) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of the defendant's felony convictions. (§ 1202.4, subd. (b)(2).) Based on that recommended calculation, appellant's restitution fines could have been well over $1,000.

bounds of reason under applicable law and relevant facts.  Accordingly, an abuse of discretion is not present.  (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; *People v. Williams* (1998) 17 Cal.4th 148, 162.)  Consequently, this claim is without merit, and we will not strike the imposed assessments or further reduce the amount of the imposed restitution fines.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.